FEDERAL DEPOSIT INSURANCE
CORPORATION,
Plaintiff-Appellee,

v.

VENTURE CONTRACTORS, INC.,
William Tedtman, and Robert
Labus, Defendants,

and

Michael Davis, Defendant-Appellant.

Nos. 86–1162, 86–1264.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 18, 1986.

Decided July 16, 1987.

Michael W. Rathsack, Chicago, Ill., for defendant-appellant.

Richard A. Wohlleber, Chapman & Cutler, Chicago, Ill., for plaintiff-appellee.

Before WOOD, COFFEY and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

Michael Davis, the defendant-appellant, appeals from the district court's judgment in favor of the Federal Deposit Insurance Corporation ("FDIC") ordering him to pay $85,441.15 plus accrued interest and costs on a guaranty. We affirm.

## I

On or about November 21, 1977, Venture Contractors, Inc. ("Venture")[1] through its authorized agent, executed a promissory note in the principal amount of $115,386.98 to North Point State Bank of Arlington Heights, Illinois ("North Point").[2] Some time prior to December 16, 1978, Michael Davis, William Tedtman, and Robert Labus signed and executed a note (guaranty) guaranteeing payment of Venture's obligations to North Point due under the November 21, 1977, note Venture had executed in favor of North Point. The guaranty provided that Davis, Tedtman and Labus were jointly and severally liable for the principal owing on the original note as well as for accrued interest, all expenses and reasonable attorneys' fees. The guaranty, a standard printed form, stated that in the event Venture failed to satisfy its obligations to North Point under the November 21, 1977, note:

"[t]he undersigned agree(s) to pay to the Bank, upon demand, the full amount which would be payable hereunder by the undersigned if all the Liabilities were then due and payable.

The right of recovery against the undersigned is limited to _____ Dollars ($_____) plus interest on such amount and plus all costs and expenses of enforcing this guaranty."

The clause limiting the guarantors' liability was never completed as the dollar amounts were never filled in. Tedtman stated in his deposition that he was at a meeting at North Point Bank at which Davis, Labus, and Donald Carrera (then president of North Point) were present. Tedtman stated that at this meeting, himself, Davis and Labus signed the guaranty in question and it was his understanding from the discussion at the meeting that Davis' guaranty was to be limited to what was known as the Oketo development project, and that when the amount owing on the Oketo development was repaid, Davis would be discharged from his obligations under the guaranty.

On December 16, 1978, North Point failed and the Commissioner of Banks and Trusts Companies of the state of Illinois took possession of North Point and appointed the FDIC as the bank's receiver. In their stipulation of facts before the trial court, the parties agreed that while the FDIC administered the North Point closing, it did not maintain records of the location of the instruments it discovered during its examination, including the guaranty signed by Davis, were found within the bank.[3] No written agreement affecting the guaranty signed by Davis was discovered in the books and records of the North Point Bank at the time of the closing, nor was any such written agreement ever found. The parties agree that it (1) is not the FDIC's practice currently, nor was it the FDIC's practice during the closing of North Point to maintain records as to the location of documents found in a bank after closing and (2) at no time has it been the FDIC's practice, and it was not the FDIC's practice during the closing of North Point, to remove written instruments from files classified as closed or inactive. The FDIC, as receiver, sold certain of North Point's assets including the note of Venture and the guaranty

---

1. Venture, an Illinois corporation, was formed by three individuals: William Tedtman, Robert Labus and an individual not relevant to this appeal.

2. Our recitation of facts is based for the most part on the stipulated facts the trial judge referred to in his January 2, 1986 decision. *Federal Deposit Insurance Corp. v. Venture Contractors, Inc., et al.,* No. 79 C 2171, Mem.Op. (N.D. Ill. Jan. 2, 1986) [Available on WESTLAW, DCT database].

3. The location of the guaranty is relevant only insofar as it helps to determine whether the guaranty was a valid asset of the bank. If the guaranty was located in an active file it was in all likelihood a valid asset. On the other hand, if the guaranty was located in a closed or inactive file, it presumably had been satisfied.

signed by Davis, Tedtman and Labus (which guaranteed the payment of the obligations of Venture to North Point) to itself acting in its corporate capacity.

Shortly thereafter, the FDIC began to pursue payment on the assets it acquired. In March 1980, after failing to receive payment from Venture and Tedtman on certain notes, the FDIC moved for and the court entered default judgments on the basis of defaulted and unpaid notes against Venture for $89,579.33 and Tedtman in the amount of $407,847.80 (on several notes where Tedtman had executed guaranties). In July 1981, summary judgment was entered in favor of the FDIC against Labus. The FDIC's summary judgment motion against Davis was denied on the basis of Davis' claim that his signature on the guaranty was a forgery.

In August 1981, the FDIC moved for partial summary judgment against Davis asking that the district court:

"[d]etermine as a matter of law that no alleged agreements relating to the intent of Michael Davis or of any other person at the time of the purported execution of the guarantee in question or of any subsequent non-written act would be admissible, either to contradict the terms of the guarantee or to impair the ability of the Federal Deposit Insurance Corporation to effect collection from Davis as guarantor of the debt of the principal obligor."

Davis responded claiming that he had an oral agreement with the Bank that his obligations under the guaranty were limited to the Oketo project. However, the guaranty does not reflect that the note was satisfied, nor was Davis' name withdrawn therefrom as an obligor. Thus Davis, Tedtman and Labus remained liable on the guaranty. "There is nothing on the face of the document manifesting the necessary existence of an additional agreement and no other bank records establish the limitation defendant [Davis] urges" that under 12 U.S.C. § 1823(e) Davis could not assert the alleged oral agreement as a defense to the FDIC's action against him on the guaranty he signed with Tedtman and Labus. *Fed-*

*eral Deposit Insurance Corp. v. Venture Contractors, Inc., et al.,* No. 79 C 2171, Mem.Op. at 6–7 (N.D.Ill. Oct. 14, 1983). However, the trial judge denied the FDIC's motion for summary judgment because he determined a factual dispute existed as to whether or not Davis had signed the guaranty and the location of the guaranty instrument in the bank when the FDIC was appointed receiver. *Id.* at 7.

In the course of preparing for the final pre-trial order, Davis chose not to contest the validity of his signature on the guaranty. Thus the only issue left before the trial judge was the question of whether the guaranty instrument had previously been placed in the bank's active or inactive files. Davis moved that the case be tried on the parties' stipulated facts together with the depositions of Tedtman and Arthur Smith, an employee of the FDIC. Smith, in his deposition, testified that it had never been the practice of the FDIC nor was it the practice during the closing of North Point to remove written instruments from closed or inactive files once a bank was closed. Davis stipulated to the FDIC's practice and procedures when closing a bank that (1) it was and is not the FDIC's practice to maintain records as to the location of "papers" found in a bank after closing, and (2) it was and is not the FDIC's practice to remove written instruments from files which were closed or inactive.

The trial court noted in reaching its decision that "the FDIC rested solely upon an assertion of a general practice, defendant rested upon inferences arising from his assertion that the guarantee was in fact dead." *Federal Deposit Insurance Corp. v. Venture Contractors, Inc., et al.,* No. 79 C 2171, Mem. Op. at 6 (N.D.Ill. Jan. 2, 1986) [Available on WESTLAW, DCT database]. The trial judge concluded that "by for the more reasonable inference" is that the guaranty instrument was located within the active files of the bank stating: "it is unlikely that the FDIC would go rummaging through closed or inactive files, and the parties agree ... that it was not the FDIC's practice generally or at North Point to remove written instruments from files which were closed or inactive files." *Id.*

Implicit in the judge's finding that the guaranty was among the active files of the bank is that it was a valid asset of North Point.

Davis appeals raising three issues: (1) did the district court properly find that his guaranty was an asset; (2) whether Davis is precluded from asserting the alleged oral agreement as a defense under 12 U.S.C. § 1823(e); (3) whether Davis' liability to the FDIC under his guaranty was satisfied or otherwise affected by the FDIC's receipt of payments from the bank's insurer.

## II

Our standard of review of the district court's findings of fact is set forth in Rule 52 of the Federal Rules of Civil Procedure: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, ..." Davis argues that the district court improperly found that the guaranty he signed was a valid asset of North Point. The Supreme Court has stated: "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

The stipulated facts upon which the district court based its finding that Davis' guaranty was in an active file and thus an asset provided:

"11. It is not the FDIC's practice currently, nor was it the FDIC's practice during the closing at North Point to maintain records as to the location of papers found in a bank after closing. Further, at no time has it been the FDIC's practice, and it was not the FDIC's practice during the closing of North Point, to remove written instruments from files which were closed or inactive files.

12. Davis has no record of the location of the subject guaranty at the time North Point was closed."

The appellant cites no relevant case law in support of his argument that the guaranty that he signed was not a valid asset. Instead he boldly states "the uncontradicted evidence here is that the guaranty was satisfied and should have been removed and that the FDIC did not know which bank files were active or inactive." The district court rejected Davis' argument finding:

"It is unlikely that the FDIC would go rummaging through closed or inactive files, and the parties agree ... that it was not the FDIC's practice generally or at North Point to remove written instruments from files which were closed or inactive files ... The FDIC rested solely upon an assertion of a general practice; defendant rested upon inferences arising from his assertion that the guaranty was in fact dead.

\*　　\*　　\*　　·\*　　\*　　\*

[E]ven if we assume that the FDIC has the burden of showing the location of the guaranty, by far the more reasonable inference is that it was among the active files of the bank, and this court so finds."

The appellant does not dispute that he, Labus and Tedtman each signed the same guaranty document. Davis in essence argues that the guaranty must have been in an inactive or a closed file since the Oketo loan had been repaid and the debt secured by his guaranty therefore had been satisfied. The appellant agreed in the stipulated set of facts that "no written agreement affecting the guaranty" was found to be a part of the records of North Point when the FDIC undertook its examination of the bank nor has any such written agreement been discovered since.

Even assuming Davis' recollection is truthful and accurate that there was an oral agreement with the bank, *his* obligations only and not those of Tedtman and Labus would have been relieved if and when the Oketo loan was repaid. The obligations of Tedtman and Labus under the guaranty were to remain as long as Venture owed money to North Point. The parties stipulated that at the time the bank

was closed Venture had defaulted on its promissory note in failing to pay the amount due under the note, and thus the obligations of the guarantors had been triggered and were owing at the time North Point went into receivership. Davis chooses to ignore the fact that (1) he, Tedtman and Labus all signed the same guaranty document and (2) no agreement complying with the requirements of 12 U.S.C. § 1823(e)[4] was found to be a part of the books and records of North Point at the time of the bank's closing. Thus, there is nothing in the North Point records to establish that Davis' obligations under the guaranty he signed along with Tedtman and Labus were ever altered or limited.

Davis stipulated to the FDIC's custom and practice of not removing written instruments from closed or inactive files during the bank's closing procedure. The trial judge stated "It is unlikely that the FDIC would go rummaging through closed or inactive files, and the parties agree that it was not the FDIC's practice generally or at North Point to remove written instruments from files which were closed or inactive files." *Federal Deposit Insurance Corp. v. Venture Contractors, Inc., et al.*, No. 79 C 2171, Mem.Op. at 6 (N.D.Ill. Jan. 2, 1986) [Available on WESTLAW, DCT database]. The trial court noted that the FDIC rested its argument upon "an assertion of a general practice" and Davis on "inferences arising from his assertion that the guaranty was in fact dead" and found that "by far the more reasonable inference is that it was among the active files of the bank." *Id.*

We hold that the trial court's finding that the guaranty was in an active file and thus a valid asset was not clearly erroneous as it was certainly plausible in view of (1) the fact that the obligations of Davis, Tedtman and Labus on the guaranty had been triggered by Venture's default but not yet satisfied, (2) the parties' stipulation that it was not the FDIC's practice to remove written instruments from files which were closed or inactive, and (3) no written agreement complying with the requirements of 12 U.S.C. § 1823(e) existed modifying the original guaranty.

### III

Davis' next argument requires that we analyze Title 12, U.S.C. § 1823(e). *See,* footnote 4, *supra.* Davis argues § 1823(e) is inapplicable since his purported agreement with the bank to limit his obligation under the guaranty was not a hidden or secret agreement that § 1823(e) precludes from being asserted against the FDIC. Davis also argues that § 1823(e) does not apply because the FDIC could not have relied upon the guaranty as an asset since the guaranty he signed was essentially blank and thus unenforceable (the execution date and the amount the guaranty was limited to were never filled in).[5]

As to Davis' first argument, the trial court found that under 12 U.S.C. § 1823(e), Davis could not assert the alleged oral agreement as a defense to his obligations under the guaranty stating that "There is nothing on the face of the document manifesting the necessary existence of an addi-

---

4. Title 12, U.S.C. § 1823(e) provides:
   "No agreement which tends to diminish or defeat the right, title or interest of the Corporation and any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) *shall be in writing,* (2) *shall have been executed by the bank* and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) *shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously,* from the time of its execution, an official record of the bank."
   (Emphasis added). As we discuss in part three of this opinion, Davis' alleged oral agreement satisfies none of the four requirements of § 1823(e).

5. It is well-accepted that the FDIC does not have to examine the assets of a failed bank before it agrees to execute a purchase and assumption. *See, e.g., Gilman v. Federal Deposit Insurance Corp.,* 660 F.2d 688, 694 (6th Cir.1981). It is only logical that if the FDIC is not required to examine a bank's assets then it cannot be obligated to rely on a particular asset in order to enforce it.

tional agreement and no other bank records establish the limitation defendant [Davis] urges." Regarding Davis' second argument that § 1823(e) does not apply because the FDIC could not have relied upon the guaranty as an asset since the guaranty he signed was essentially blank, the trial court found that the blanks in the guaranty (the execution date and the amount the guaranty was limited to) did not affect the validity of the guaranty. The trial court found that:

> "The date the guaranty was signed is completely immaterial, since this provision required the defendant to assume liability for any past or future liabilities of Venture Contractors. The only way the defendant could end his obligation as a guarantor under the contract was if he provided 'written notice to the Bank of discontinuance' of the guaranty. The date of such notice might well be material, but the date the original guaranty was executed is not."

*Federal Deposit Insurance Corp. v. Venture Contractors, Inc., et al.,* No. 79 C 2171, Mem.Op. at 2 (N.D.Ill. June 27, 1980). The district court found that the fact that the space provided on the guaranty for specifying the amount of the guarantors' liability was left blank did not preclude the application of § 1823(e) since there was nothing "on the face of the document manifesting the necessary existence of an additional agreement and no other bank records" limiting the guaranty. *Federal Deposit Insurance Corp. v. Venture Contractors, Inc., et al.,* No. 79 C 2171, Mem.Op. at 6 (N.D.Ill. Oct. 14, 1983).

The impetus for 12 U.S.C. § 1823(e) was the Supreme Court's decision in *D'oench, Duhme and Co. v. Federal Deposit Insurance Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). In *D'oench* the petitioner executed a demand note for $5,000 in favor of the Bellville Bank and Trust Co. in renewal of notes signed several years previously. The petitioner had sold the bank certain bonds and the obligor subsequently defaulted. The original notes were executed in order that the bank might be able to carry the notes without any past due bonds appearing among the bank's assets.[6] The receipts for the notes included the notation: "This note is given with the understanding it will not be called for payment. All interest payments to be repaid." In 1938, the bank needed a loan of over $1,000,000 from the FDIC to remain solvent. The petitioner's note was acquired as part of the collateral securing the loan. After the bank subsequently failed, the FDIC sought to collect the money owing pursuant to the terms of the note. The petitioner protested on the grounds of the language of the alleged separate agreement ("This note is given with the understanding it will not be called for payment.") and further that the note had been issued without adequate consideration. The Supreme Court held as a matter of federal common law that any agreement would not be enforceable against the FDIC that "was designed to deceive the creditors or the public authority or would tend to have that effect." 315 U.S. at 460, 62 S.Ct. at 681.

In 1950 Congress codified the principle established in *D'oench.* This court recently discussed the objective of section 1823(e) in *Federal Deposit Insurance Corp. v. O'Neil,* 809 F.2d 350 (7th Cir.1987):

> "The purpose behind section 1823(e), enacted in 1950, is to enable the FDIC, in deciding to proceed with respect to a troubled bank, to make a quick and certain inventory of the bank's assets. It can do that only if it can disregard secret oral agreement that may impair the value of those assets.

> \*    \*    \*    \*    \*    \*

> [T]he statute makes the common law principle both more encompassing and more precise. It requires that the agreement, to be effective against the FDIC, be written, be executed contemporaneously with the acquisition of the asset

---

6. The Supreme Court described it thusly:
   "Petitioner's president who signed the original notes knew that they were executed so that the past due bonds would not appear among the assets of the bank, and that the purpose of the interest payments was to 'keep the notes alive.'"
   315 U.S. at 454, 62 S.Ct. at 678.

..., be approved by the bank's board of directors or its loan committee, be noted in the bank's minutes, and, continuously from the time of execution, be an official record of the bank."

*Id.* at 353.

■ Davis' argument that his purported oral agreement with the bank limited his liability on the guaranty is at odds with a most important requirement of § 1823(e): the agreement must be in writing. In addition, the record reflects the agreement was never executed, nor was it approved by the bank's board of directors or its loan committee nor reflected in the bank's minutes and was not continuously (or ever) an official record of the bank.

The alleged oral agreement the appellant wishes to have supersede the guaranty he signed is exactly the type of agreement § 1823(e) seeks to prohibit. None of the statutory requirements of § 1823(e) were satisfied in the alleged oral agreement. Davis' assertion that the alleged oral agreement was not secret is without foundation. No record was found in the bank's files delineating the limitation Davis urges. In addition, Davis, himself, possesses no signed or official document (or any documentation) that would limit his liability on the guaranty. As we noted in *O'Neil*, the purpose of § 1823(e) "is to enable the FDIC in deciding how to proceed with respect to a troubled bank to make a quick and certain inventory of the bank's assets." *Id.* To uphold Davis' alleged oral agreement as valid would fly in the face of clear intent of § 1823(e).

Davis' reliance on our decision in *Howell v. Continental Credit Corp.*, 655 F.2d 743 (7th Cir.1981) is misplaced. In *Howell*, Mrs. Howell and the Continental Credit Corp. entered into an agreement in which Continental agreed to purchase various broadcasting equipment and then lease it to Mrs. Howell. In order to obtain the necessary financing ($900,000), Continental discounted the leases with a Chicago bank (Drovers National Bank) and assigned all of its rights under the leases to the bank. Mrs. Howell, to secure her performance under the leases, deposited $1,000,000 worth of common stock in an escrow account at the bank, but rather than using all of the money to purchase equipment for Mrs. Howell, Continental used "the bulk" of it for other purposes. Eventually Drovers became insolvent, and after the FDIC was appointed receiver by the Comptroller of Currency, it executed a purchase and assumption agreement[7] with the Howell leases being purchased as a part of it.

On appeal, this court was called upon to decide whether the FDIC purchased the leases subject to Mrs. Howell's defense that Continental failed to provide adequate consideration. The FDIC claimed that Mrs. Howell was estopped from defending against the FDIC upon her claims against Continental under *D'oench* and section 1823(e). We held that the FDIC was bound by the terms of the leases since section 1823(e) is inapplicable "where the document the FDIC seeks to enforce is one, such as the leases here, which facially manifests *bilateral* obligations and serves as the basis of the lessee's defense." *Id.* at 746 (emphasis in original). The court went on to note that Mrs. Howell's defense "arises directly and explicitly from the provisions of the leases which were in the bank's files and which the FDIC now seeks to enforce." *Id.* at 747. The FDIC could not purchase Continental's interest without also assuming Continental's responsibilities under the leases.

In *Howell*, this court approvingly quoted language from *Riverside Park Realty Co. v. Federal Deposit Insurance Corp.*, 465 F.Supp. 305, 313 (M.D.Tenn.1978): " 'When, however, the asset upon which the FDIC is attempting to recover is *the very same agreement* that the makers allege has been breached by the FDIC's assignors, § 1823(e) does not apply.' " *Id.* at

---

7. The purchase and assumption agreement consisted of two agreements. In the first agreement the FDIC transferred Drovers' deposit liability to a new bank, The Drovers Bank of Chicago. In the second agreement the FDIC, as receiver, transferred the not readily marketable assets of the insolvent bank to itself in its corporate capacity. Among these assets was the loan portfolio containing the Howell leases.

747 (emphasis in original). In the instant case, as opposed to *Howell*, the guaranty instrument in question is not a lease but a continuing guaranty in which Davis guaranteed "the indebtedness, liabilities, and obligations of every kind and nature of [Venture] . . . now or hereafter existing, or due or to become due." In addition, there is a purported side agreement which was not a part of the bank's records. As we noted previously, the provisions of the lease Mrs. Howell sought to enforce were present in the lease itself not in a purported side agreement. We hold that section 1823(e) is clearly applicable to the circumstances present in this case since Davis' alleged oral agreement fails to comply with the requirements of section 1823(e) in that it is not in writing, was never executed, was not approved by the bank's board of directors or its loan committee, was not reflected in the bank's minutes, and was not continuously an official record of the bank.[8]

■ In analyzing Davis' argument that § 1823(e) does not apply because the FDIC could not have relied upon the guaranty as an asset since the guaranty he signed was essentially blank (the execution date and the limitation on the obligors' liability were not filled in), the case *Federal Deposit Insurance Corp. v. Powers*, 576 F.Supp. 1167 (N.D.Ill.1983), *aff'd*, 753 F.2d 1076 (7th Cir.1984) is particularly helpful. In *Powers*, the defendant Powers signed guaranty forms in blank with the Drovers National Bank of Chicago. After the bank was declared insolvent, the FDIC, in its corporate capacity, obtained the bank's assets and brought suit in that capacity. The defendant Powers argued that he signed a blank guaranty which was not completed according to his oral agreement with the bank's president, since he never intended to guarantee the obligation in question. The district court noted that "Executing guarantees in blank is not good practice." 576 F.Supp. at 1171. In holding that § 1823(e) applied, the district judge stated:

"The FDIC sues Powers on a facially sufficient written guarantee, and he wishes to defend on the basis of informal, unwritten arrangements and understandings between him and Drovers officials. These arrangements and understandings may have been convenient for the parties thereto, but they were not reflected on Drovers' records. Powers wishes ultimately to prove that no guarantee contract ever existed, but that does not change the fact that he is asserting the type of private agreement that is invalidated by § 1823(e)."

*Id. Cf. Federal Deposit Insurance Corp. v. Hatmaker*, 756 F.2d 34 (6th Cir.1985). In the instant case Davis no longer denies that he signed the guaranty he now attacks as incomplete. Davis, Tedtman and Labus did not sign a blank guaranty; only the execution date and the limitation on the obligors' liability were left blank. The fact that the guaranty was not dated is irrelevant since the guaranty made those who signed liable for all debts of Venture Contractors "now or hereafter existing, or due or to become due."[9] We note that the

---

**8.** Davis' argument that he was "wholly innocent of wrongful conduct" and thus relieved from the burdens of section 1823(e) is contrary to prevailing case law. The Supreme Court's opinion in *D'oench* made clear that its decision was not predicated upon whether the maker of a note had a fraudulent intent. 315 U.S. at 458–60, 62 S.Ct. at 679–80.

**9.** Davis could have satisfied his obligation as guarantor under the contract by providing "written notice to the Bank of discontinuance" of the guaranty. The guaranty specifically provides:

"This guaranty shall be a continuing, absolute and unconditional guaranty and shall remain in full force and effect subject to discontinuance as to any of the undersigned (including, without limitation, any undersigned who shall become deceased, incompetent or dissolved) only as follows, any of the undersigned, and any person duly authorized and acting on behalf of any of the undersigned, may give written notice to the Bank of discontinuance of this guaranty as to the undersigned by whom or on whose behalf such notice is given, but no such notice shall be effective in any respect until it is actually received by the Bank and no such notice shall affect or impair the obligations hereunder of the undersigned by whom or on whose behalf such notice is given with respect to any Liabilities or any indebtedness, liabilities or obligations of the undersigned, or any of them, to the Bank existing at the date of receipt of such

guaranty in *Powers* was not dated but was found to be valid. Davis is responsible for signing the guaranty in blank. The fact that part of the guaranty was blank (the execution date and the limitation on the obligors' liability were not filled in) does not render § 1823(e) inapplicable since § 1823(e) precludes defenses that do not satisfy its strict requirements. We thus hold that the guaranty's incompleteness did not affect the validity of the guaranty.

## IV

■ Davis lastly argues that his liability under the guaranty he signed is extinguished by the FDIC's receipt of a total of $3,350,000 from North Point's insurer. The facts to which Davis stipulated to before the trial court provided:

"16. A blanket bond claim was made by the former North Point Bank of Arlington Heights, Illinois, upon the insurance carrier, Employer's Insurance of Wausau, in November, 1978. The proofs of loss filed at that time totaled $4.2 million and included loans made to William Tedtman and Venture Contractors. On April 24, 1980, the FDIC entered into a settlement agreement on the blanket bond claim whereby the FDIC received the sum of $2.5 million. The amount paid by Employers to the FDIC was a lump sum payment which was not made in relation to individual claims of loss.

17. Following the closing of the North Point State Bank in December, 1978, the FDIC made a claim under the Directors' and Officers' Liability Policy, again written by Employers Insurance of Wausau, for a total amount of $1.6 million. On May 21, 1981, a settlement agreement was approved in the approximate amount of $850,000 and Employers paid that amount to the FDIC. As in the blanket bond claim, the lump sum settlement payment made by Employers to the

notice by the Bank. Any such notice of discontinuance by or on behalf of any of the undersigned shall not affect or impair the obligations hereunder of any other of the undersigned.

FDIC did not relate to individual loan transactions.

18. Under the terms of the blanket bond settlement agreement with Employers, the FDIC is entitled to pursue all claims set forth in the proof of loss on its own behalf until it recovers the full amount of its proof of loss ($4.2 million).

19. To date the FDIC has not recovered the full amount of its proof of loss."

Davis has cited no case nor do we know of one holding that a borrower and his guarantor are relieved of their repayment obligations after the bank or the FDIC receives a partial payment from the bank's insurer and such payment was not made in relation to any particular claim of loss. The parties stipulated the payments from the insurer did not relate to any particular loan and that the FDIC has not recovered the full amount of its proof of loss. We hold that the FDIC's receipt of payments from North Point's insurer has no effect on Davis' obligations under the guaranty he signed since the FDIC has not recovered the full amount of its proof of loss and the payments did not relate to any particular loan.

## V

We agree with the district court's finding that the guaranty signed by Davis, Tedtman and Labus was an asset of North Point and section 1823(e) precludes Davis' alleged oral agreement from being used to alter Davis' obligations under the guaranty. We also hold the FDIC's receipt of money from North Point's insurer does not affect Davis' liability under the guaranty, and uphold the trial court's order that Davis pay the FDIC $85,441.15 and accrued interest plus costs.[10]

AFFIRMED.

**10.** The FDIC seeks attorneys' fees pursuant to Rule 38 of the Federal Rules of Appellate Procedure which provides that "If a court of appeals shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee." In *Indianapolis Colts v. Mayor and City Council of Baltimore*, 775 F.2d

177, 184 (7th Cir.1985), we stated "An appeal is frivolous when the result is obvious or when the appellant's argument is wholly without merit." Although Davis' case may be of questionable merit, it is not such that we would deem it frivolous and award attorneys' fees as requested by appellee. *Cf. Chicago Newspaper Publishers' Association v. Chicago Web Printing Pressmen's Union No. 7,* 821 F.2d 390 (7th Cir.1987).